## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLANE E. TAYLOR WELDING, INC. and BLANE E. TAYLOR,<br><br>*Plaintiffs*,<br><br>v.<br><br>LG FUNDING LLC, JOSEPH LERMAN, ONTRACK FUNDING, LLC, and JOHN AND JANE DOE CONTROL PERSONS,<br><br>*Defendants*. | CASE NO.: _____<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Blane E. Taylor Welding, Inc. and Blane E. Taylor, by and through their undersigned counsel, respectfully states as follows against Defendants LG Funding LLC, Joseph Lerman, OnTrack Funding, LLC, and John and/or Jane Doe Control Persons.[1]

### <u>INTRODUCTION</u>

1.      This is a RICO action against a MCA company that is controlled, managed, and manipulated by Lerman to carry out a long-running scheme to collect unlawful debts and otherwise fraudulently obtain hundreds of thousands of dollars from unsuspecting businesses, including BT Welding.

---

[1] The following defined terms are used herein:  Plaintiff Blane E. Taylor Welding, Inc. ("BT Welding"); Plaintiff Blane E. Taylor ("Taylor"); Defendant LG Funding LLC ("LG"); Defendant Joseph Lerman ("Lerman"); Defendant OnTrack Funding LLC ("OnTrack"); Defendant John and Jane Doe Control Persons ("OnTrack Control Persons"); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); merchant cash advance ("MCA").

2.     In furtherance of their shared goal of usurious lending, LG and OnTrack—who also provides its own purported "MCA" financing[2]—worked together by identifying, soliciting, and recruiting and then issuing, servicing, and collecting, respectively, usurious loans—deceptively styled as MCAs—that were issued to merchants, such as Plaintiffs.

3.     Over the course of eleven months, Plaintiffs and LG—the MCA lender who was introduced by OnTrack—entered into *five* separate MCA transactions,[3] pursuant to which LG purportedly advanced a lump sum to purchase BT Welding's future receipts at a discount, and BT Welding agreed to repay the face value of such purchased receipts through regular, weekly payments.

4.     While labeled as a purchase and sale of future receipts, the Contracts' terms, conditions, and obligations, and Defendants' corresponding actions, demonstrate that despite their form, *no sale of receipts ever occurred* and the form of the Contracts was merely a facade to evade applicable usury laws.

5.     The LG Loans are, in reality, loan transactions that *each* charge interest at a rate exceeding 50% A.P.R., *i.e.*, *more than twice* the maximum lawful rate of interest allowed by New York law.

---

[2] *See, e.g.,* OnTrack Website ("We provide three key business financial solutions:  Merchant Cash Advance…"), *available at:*  https://ontrack-funding.com/.

[3] *See* **Exhibit 1** (Standard Merchant Cash Advance Agreement, dated March 3, 2021) ("March 2021 MCA"); **Exhibit 2** (Standard Merchant Cash Advance Agreement, dated June 22, 2021) ("June 2021 MCA"); **Exhibit 3** (Standard Merchant Cash Advance Agreement, dated Sept. 1, 2021) ("Sept. 2021 MCA"); **Exhibit 4** (Standard Merchant Cash Advance Agreement, dated March 3, 2021) ("Nov. 2021 MCA"); **Exhibit 5** (Standard Merchant Cash Advance Agreement, dated Feb. 2, 2022) ("Feb. 2022 MCA").  The March 2021 MCA, June 2021 MCA, Sept. 2021 MCA, Nov. 2021 MCA, and Feb. 2022 MCA are collectively referred to as the "Contracts," and the collective MCA transaction resulting from the execution of the Contracts is referred to herein as the "LG Loans."

6.    Further demonstrating the true nature of the LG Loans, LG's MCA broker—OnTrack—*repeatedly* referred to the transaction as a "loan" that imposed definite payment terms.[4]

## PARTIES

7.    Plaintiff BT Welding is a corporation organized and existing under the laws of the State of Florida, with its principal place of business located at 1760 N. U.S. Highway, Ormond Beach, FL 32174.

8.    Plaintiff Taylor is a permanent resident of, is domiciled in, and is therefore a citizen of the State of Florida.

9.    Plaintiff Taylor is the Founder and President of BT Welding.

10.    Defendant LG is a limited liability company formed under the laws of the State of New York, with its principal place of business located at 1218 Union Street, Suite 2, Brooklyn, NY 11225.

11.    Defendant Lerman is a permanent resident of, is domiciled in, and is therefore a citizen of the State of New York.

12.    Upon information and belief, Lerman is the Founder, President, Manager, Member, Managing Member, and/or Chief Executive Officer of LG, and at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control LG's statements, representations, and decisions.

---

[4] *See* **Exhibit 6** (LinkedIn profile for Kevin White, Funding Executive with OnTrack Funding); **Exhibit 7** (text message from Kevin White to Taylor stating on Aug. 10, 2021 that "2 payments bounced for *LG* my [*sic*] *loan*…") (emphasis added); **Exhibit 8** (text messages from Kevin White to Taylor on Feb. 14, 2022, stating "Right now you owe 85k left on one of the *loans*," discussing, upon information and belief, the remaining balance owed under the Sept. 2021 MCA); **Exhibit 9** (text messages from Kevin White to Taylor on Feb. 14, 2022, stating "It's [gonna] pay off the old *loan*…," referring, upon information and belief, to the Sept. 2021 MCA).

13.     Upon information and belief, Defendant OnTrack is a limited liability company formed under the laws of the State of New York, with its principal place of business located at 1413 Avenue J, Brooklyn, NY 11230.

14.     Upon information and belief, Defendant OnTrack Control Persons are permanent residents of, are domiciled in, and are therefore citizens of the State of New York.

15.     Upon information and belief, OnTrack Control Persons are the Founder, President, Manager, and/or Chief Executive Officer of OnTrack, and at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control OnTrack's statements, representations, and decisions.

## JURISDICTION

16.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself to the laws of New York for the transactions at issue, or has selected New York as the forum for all disputes relating to the transactions.

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs are asserting a claim under RICO.  *See* 18 U.S.C. §§ 1961-68.

18.     Venue is proper pursuant to 27 U.S.C. §§ 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in this District as LG operates its business in this District.

19.     Notwithstanding that the subject contracts are void *ab initio* and thus unenforceable under New York law, Defendants should be estopped from denying that the jurisdiction or venue is proper in this Court because the Contracts provide that any action brought by either party

concerning the LG Loans must be brought in the state or federal courts located in the State of New York.[5]

## **FACTUAL ALLEGATIONS**

### *The Predatory MCA Industry*

20.     Defendants' conduct is part of a ballooning national endemic that has caught the attention of both state and federal law enforcement and regulators, as well as the New York Court of Appeals[6] and the U.S. Congress.[7]

---

[5] *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 325-33 (N.Y. 2021); March 2021 MCA at ¶ 39; June 2021 MCA at ¶ 39; Sept. 2021 MCA at ¶ 39; Nov. 2021 MCA at ¶ 39; and Feb. 2022 MCA at ¶ 39.  Additionally, because each of the Contracts are criminally usurious loans and, thus, void *ab initio* and unenforceable, the purported jury waiver, counterclaim waiver, 1-year statute of limitations, class action waiver, arbitration clause, legal fees clause, and pre- and post-judgment interest clause contained therein are each equally unenforceable.

[6] *See Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45 (N.Y. Dec. 16, 2021) (finding substantially similar MCA agreements did "not bear several of the hallmarks of traditional factoring agreements" and, instead, imposed transactions that "appear less like factoring agreements and more like high-interest loans that might trigger usury concerns") (citing *Adar Bays*, 37 N.Y.3d 320).

[7] *See, e.g., People of the State of N.Y. v. Richmond Capital Group LLC et al*, Index No. 451368/2020 (N.Y. Sup. Ct.) (alleging the individual defendants, through three separate companies purportedly offering alternative financing through purchase and sale of future receivables, commonly known as "merchant cash advance" transactions, engaged in criminal usurious *lending*, in contravention of New York's Penal Law); *Federal Trade Commission v. Yellowstone Capital LLC et al*, Docket No. 1:20-cv-06023 (S.D.N.Y.) (alleging defendants operated an unlawful enterprise that engaged in deceptive and unfair practices through MCA transactions); *Federal Trade Commission v. RCG Advances, LLC et al*, Docket No. 1:20-cv-04432 (S.D.N.Y.) (same); *Crushed By Confessions Of Judgment: The Small Business Story*, Hearing before the House Small Business Committee, 116th Congress (2019-20), *available at:* https://bit.ly/3PbPNgy (last accessed Sept. 6, 2022).  *See also* Bloomberg.com, *Sign Here to Lose Everything*, *available at:*  https://bloom.bg/2YqoCVx (last accessed Sept. 6, 2022) (investigative series of the predatory MCA industry).

21.     The MCA industry has often been compared to the similarly predatory payday

lending industry—albeit for businesses—where "interest rates can exceed 500 percent a year, or

50 to 100 times higher than a bank's."[8]

22.     In order to circumvent applicable usury laws, MCA companies, including LG, style

their agreements as "purchases and sales of future receivables," which contain representations,

including that the transactions are not loans, that the MCA company is purchasing a discounted,

fixed amount of the merchant's future receivables, which will be repaid through regular—daily or

weekly—ACH withdrawals that represent the agreed-upon percentage of the merchant's receipts.

23.     Contrary to the MCA company's representations and form of the agreement, the

operation of the MCA agreement ensures that the transaction is absolutely repayable and, in reality,

*a loan*.

### Defendants Disguised the True Nature of the Transactions

24.     Despite certain misleading language, the Contracts each impose, in reality, *a loan*

transaction, rather than a sale and purchase of Plaintiffs' future receivables.

25.     Indeed, the Contracts have *none* of the indicia of a true sale and, instead, possess

*all* of the indicia of a loan.  For example:

a.  LG seeks payment of the purchased amount *from BT Welding* (*i.e.,* the party
who "sold" its receivables) and *not* the customers, vendors, and/or third-party
payors of the purportedly "purchased" receivables.  Indeed, the Contracts
require that LG be provided with direct, unbridled access to *BT Welding's* bank
account so it can ACH debit the weekly installment payment amount from BT
Welding—*like a loan*;

b.  The weekly payments stipulated in each of the Contracts are, in fact, fixed
installments based upon the timeframe within which LG wants to be paid,
causing the purchased amount to be repaid within a specified time—*like a loan*;

---

[8] *See* Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, Bloomberg (Nov. 13, 2014), *available at:*  https://bloom.bg/3dkV1JC (last accessed Sept. 6, 2022).

    c.   The default and remedy provisions set forth in the Contracts purported to hold Plaintiffs—*rather than the customers, vendors, and/or third-party payors of the purportedly purchased future receivables*—absolutely liable for repayment of the purchased amount.  Indeed, in the event of a default, LG could seek repayment from BT Welding *and* Taylor, who LG required personally guarantee BT Welding's repayment of the purchased amount;

    d.   BT Welding—*rather than the customers, vendors, and/or third-party payors of the purportedly purchased future receivables*—is obligated to ensure that sufficient funds are maintained in its designated bank account so the fixed, weekly repayment installment can be withdrawn.  Indeed, if LG is unable to withdraw the full installment amount due to insufficient funds, *Plaintiffs—and not the customers, vendors, and/or third-party payors of the purportedly purchased future receivables*—can be found in default and, upon default, the corresponding outstanding balance of the purchased amount becomes immediately due and payable;

    e.   although the Contracts purport to "purchase" and, as a result, "assign" and "transfer" all of BT Welding's future accounts receivable until the purchased amount is paid, BT Welding—*and not LG*—retains all the indicia of ownership over the "purchased" future accounts receivable, including the right to collect, possess, and use the proceeds thereof—*like a loan*; and

    f.   LG acquires a *security interest* in the BT Welding's "collateral," that is defined as collectively:  all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), and all proceeds, as defined by Article 9 of the UCC to secure repayment of the purchased amount—*like a loan*.

26.    The Contracts contain additional terms that, among other things, ensure the purchased amount is absolutely repayable under all circumstances.  For example:

    a.   LG may ACH debit BT Welding's accounts, regardless of where situated and the source of the funds in such accounts;

    b.   BT Welding will maintain business-interruption insurance naming LG as loss payee and additional insured in amounts and against risks as are satisfactory to LG and shall provide LG proof of such insurance upon request;

    c.   BT Welding cannot seek financing from other sources;

    d.   Plaintiffs waive their right to a trial by jury;

    e.   Plaintiffs waive their right to assert counterclaims in any litigation or arbitration commenced by LG;

    f.   Plaintiffs waive their right to commence or be a party to a class action; and

    g.   Plaintiffs waive their right to a trial and, instead, must arbitrate all disputes arising from the Contracts.

27.    To further aid in concealing the real character of the LG Loans, the Contracts contain false statements such as the transaction imposed by the Contracts is *not a loan*. *See* Contracts at ¶ 15.

28.    Contrary to their documented form, the LG Loans are *loan* transactions, as neither the benefits nor the risks—chiefly among which being the *risks of non-performance* of BT Welding's customers, vendors, and/or third-party payors of the "sold" purchased future receivables—***all*** *remain with BT Welding*, and were neither assigned nor transferred to LG—*as would be the case if a true sale and purchase of Plaintiffs' receivables had occurred.*

### *The Unlawful, Usurious LG Loans*

29.    As stated above, between March 2021 and February 2022, Plaintiffs and LG entered into *five* separate transactions:

### *The First Loan*

30.    On or about March 3, 2021, Plaintiffs and LG entered into the first contract (the "March 2021 MCA").

31.    The March 2021 MCA purportedly provided Plaintiffs with an advance of $75,000.00 ("First Purchase Price") for the purchase price of all of BT Welding's future receivables until such time as the amount of $102,750.00 ("First Purchased Amount") was repaid.

32.    The First Purchased Amount was to be repaid through weekly ACH withdrawals in the amount of $2,569.00, and such amount would be repaid in just about 40 weeks which, on its face, translates to an annualized interest rate of *more than 48%, which exceeds the maximum lawful interest rate allowed by New York law.*

33.     Plaintiffs, however, did not receive the full First Purchase Price.   Instead, Defendants withheld $1,550.00 and, thus, Plaintiffs should have received $73,450.00.

34.     Defendants' withholdings and fees were not the only deductions from the First Purchase Price.

35.     Indeed, Plaintiffs did not receive $73,450.00 because Plaintiffs—*rather than LG*— were required to pay *LG's MCA broker*, OnTrack, its fees from the First Purchase Price.  After paying OnTrack $6,999.00, BT Welding received a net amount of $66,451.00.

36.     In receiving a net amount of $66,451.00 and being obligated to repay $102,750.00, to be repaid through weekly withdrawals of $2,569.00, LG charged Plaintiffs an estimated *71% A.P.R.* through the March 2021 MCA, *i.e.,* **more than twice** *the maximum lawful rate of interest allowed by New York law*.

37.     Between March 3, 2021 and August 26, 2021—*a mere 24-week period of time*— LG collected $64,225.00 from BT Welding, with *each and every* withdrawal *always* in the same amount of $2,569.00—*like a loan*.

38.     Due to the financial burden of the March 2021 MCA, and the fixed, weekly installments thereunder, Plaintiffs were forced to enter into another MCA *merely in order to pay the March 2021 MCA*.  Indeed, the proceeds from the Sept. 2021 MCA (as defined below) were used to pay the remaining outstanding balance owed under the March 2021 MCA—rather than being repaid from the receivables LG "purchased" thereunder.

<u>*The Second Loan*</u>

39.     On or about June 22, 2021, Plaintiff and LG entered into the second contract (the "June 2021 MCA").

40.     The June 2021 MCA purportedly provided Plaintiff with an advance of $50,000.00 ("Second Purchase Price") for the purchase price of all of BT Welding's future receivables until such time as the amount of $70,00.00 ("Second Purchased Amount") was repaid.

41.     The Second Purchased Amount was to be repaid through weekly ACH withdrawals in the amount of $2,000.00, and such amount would be repaid in just about 35 weeks which, on its face, translates to an annualized interest rate of *more than 59%, or **more than twice** the maximum lawful interest rate allowed by New York law*.

42.     Plaintiffs, however, did not receive the full Second Purchase Price.  Instead, Defendants withheld $1,050.00 and, thus, Plaintiffs should have received $48,950.00.

43.     Defendants' withholdings and fees were not the only deductions from the Second Purchase Price.

44.     Indeed, Plaintiffs did not receive $48,950.000 because Plaintiffs—*rather than LG*—were required to pay OnTrack (still serving in its capacity as *LG's MCA broker*) its fees from the Second Purchase Price.  After paying OnTrack $5,000.00, BT Welding received a net amount of $43,950.00.

45.     In receiving a net amount of $43,950.00 and being obligated to repay $70,00.00, to be repaid through weekly withdrawals of $2,000.00, LG charged Plaintiffs an estimated *88% A.P.R.* through the March 2021 MCA, *i.e., **more than twice** the maximum lawful rate of interest allowed by New York law*.

46.     Between July 1, 2021 and November 10, 2021—*a mere 19-week period of time*— LG collected $40,000 from BT Welding, with *each and every* withdrawal *always* in the same amount of $2,000.00—*like a loan*.

47.     Due to the financial burden of the June 2021 MCA and the fixed, weekly installments thereunder, Plaintiffs were forced to enter into another MCA *merely in order to pay the June 2021 MCA*.  Indeed, the proceeds from the Nov. 2021 MCA (as defined below) were used to pay the remaining outstanding balance owed under the June 2021 MCA—rather than being repaid from the receivables LG "purchased" thereunder.

*The Third Loan*

48.     On or about September 1, 2021, Plaintiff and LG entered into the third contract (the "Sept. 2021 MCA").

49.     The Sept. 2021 MCA purportedly provided Plaintiff with an advance of $105,000.00 ("Third Purchase Price") for the purchase price of all of BT Welding's future receivables until such time as the amount of $141,750.00 ("Third Purchased Amount") was repaid.

50.     The Third Purchase Amount was to be repaid through weekly ACH withdrawals in the amount of $2,954.00, and such amount would be repaid in just about 48 weeks which, on its face, translates to an annualized interest rate of *more than 38%, which exceeds the maximum lawful interest rate allowed by New York law*.

51.     Plaintiffs, however, did not receive the full Third Purchase Price.  Instead, Defendants withheld $2,150.00 and, thus, Plaintiffs should have received $102,850.00.

52.     Again, Defendants' withholdings and fees were not the only deductions from the Third Purchase Price.

53.     Indeed, Plaintiffs did not receive $102,850.00 because Plaintiffs—*rather than LG*—were required to pay OnTrack (still serving in its capacity as LG's MCA broker) its fees from the Third Purchase Price.

54.     After paying OnTrack $5,000.00 and deducting the outstanding balance owed under the March 2021 MCA, BT Welding only received $64,275.00.

55.     In receiving a net amount of $64,275.00 and being obligated to repay $141,750.00, to be repaid through weekly withdrawals of $2,954.00, LG charged Plaintiffs an estimated *130% A.P.R.* through the Sept. 2021 MCA, *i.e.,* **more than twice** *the maximum lawful rate of interest allowed by New York law.*[9]

56.     Between September 2, 2021 and February 10, 2022—*a mere 23-week period of time*—LG collected $70,896.00 from BT Welding, with *each and every* withdrawal *always* in the same amount of $2,954.00—*like a loan*.

57.     Due to the financial burden of the Sept. 2021 MCA and the fixed, weekly installments thereunder, Plaintiffs were forced to enter into another MCA *merely in order to pay the Sept. 2021 MCA.* Indeed, the proceeds from the Feb. 2022 MCA (as defined below) were used to pay the remaining outstanding balance owed under the Sept. 2021 MCA—rather than being repaid from the receivables LG "purchased" thereunder.

### *The Fourth Loan*

58.     On or about November 10, 2021, Plaintiff and LG entered into the fourth contract (the "Nov. 2021 MCA").

59.     The Nov. 2021 MCA purportedly provided Plaintiff with an advance of $90,000.00 ("Fourth Purchase Price") for the purchase price of all of BT Welding's future receivables until such time as the amount of $117,000.00 ("Fourth Purchased Amount") was repaid.

---

[9] Upon information and belief, LG did not credit Plaintiffs for all amounts paid under the prior MCA (*i.e.*, the March 2021 MCA) and, thus, the interest rate calculated herein represents the most accurate calculation of the true interest rate, and was calculated by comparing the (a) amount actually loaned to Plaintiffs and (b) the total amount Plaintiffs were expected to repay LG, and adjusting that interest rate for the repayment duration (calculated by dividing the repayment amount by the weekly installment amount).

60.     The Fourth Purchase Amount was to be repaid through weekly ACH withdrawals in the amount of $2,340.00, and such amount would be repaid in just about 50 weeks which, on its face, translates to an annualized interest rate of *more than 31%, which exceeds the maximum lawful interest rate allowed by New York law*.

61.     Plaintiffs, however, did not receive the full Fourth Purchase Price.  Instead, Defendants withheld $1,850.00 and, thus, Plaintiffs should have received $88,150.00.

62.     In similar fashion, Defendants' withholdings and fees were not the only deductions from the Fourth Purchase Price.

63.     Indeed, Plaintiffs did not receive $88,150.00 because Plaintiffs—*rather than LG*— were required to pay OnTrack (still serving in its capacity as LG's MCA broker) its fees from the Fourth Purchase Price.

64.     After paying OnTrack $7,000.00 and deducting the outstanding balance owed under the June 2021 MCA, BT Welding only received $58,150.00.

65.     In receiving a net amount of $58,150.00 and being obligated to repay $117,000.00, to be repaid through weekly withdrawals of $2,340.00, LG charged Plaintiffs an estimated *105% A.P.R.* through the Nov. 2021 MCA, *i.e., **more than twice** the maximum lawful rate of interest allowed by New York law*.[10]

66.     Between November 18, 2021 and April 21, 2022—*a mere 22-week period of time*— LG collected $53,820.00 from BT Welding, with *each and every* withdrawal *always* in the same amount of $2,340.00—*like a loan*.

---

[10] Upon information and belief, LG did not credit Plaintiffs for all amounts paid under the prior MCA (*i.e.*, the June 2021 MCA) and, thus, the interest rate calculated herein represents the most accurate calculation of the true interest rate, and was calculated by comparing the (a) amount actually loaned to Plaintiffs and (b) the total amount Plaintiffs were expected to repay LG, and adjusting that interest rate for the repayment duration (calculated by dividing the repayment amount by the weekly installment amount).

67.     Due to the financial burden of the Nov. 2021 MCA and the fixed, weekly installments thereunder, Plaintiffs were forced to enter into another MCA with another MCA company.

### *The Fifth Loan*

68.     On or about February 14, 2022, Plaintiff and LG entered into the fifth contract (the "Feb. 2022 MCA").

69.     The Feb. 2022 MCA purportedly provided Plaintiff with an advance of $145,000.00 ("Fifth Purchase Price") for the purchase price of all of BT Welding's future receivables until such time as the amount of $203,000.00 ("Fifth Purchased Amount") was repaid.

70.     The Fifth Purchase Amount was to be repaid through weekly ACH withdrawals in the amount of $3,760.00, and such amount would be repaid in just about 54 weeks which, on its face, translates to an annualized interest rate of *more than 38%, which exceeds the maximum lawful interest rate allowed by New York law.*

71.     Plaintiffs, however, did not receive the full Fifth Purchase Price.   Instead, Defendants withheld $2,950.00 and, thus, Plaintiffs should have received $142,050.00.

72.     Similarly, Defendants' withholdings and fees were not the only deductions from the Fifth Purchase Price.

73.     Again, Plaintiffs—*rather than LG*—were required to pay OnTrack (still serving in its capacity as LG's MCA broker) its fees from the Fourth Purchase Price.

74.     After paying OnTrack $6,500 and deducting the outstanding balance owed under the Sept. 2021 MCA, BT Welding only received $71,196.00.

75.     In receiving a net amount of $71,196.00 and being obligated to repay $203,000.00, to be repaid through weekly withdrawals of $3,760.00, LG charged Plaintiffs an estimated *178%*

*A.P.R.* through the Feb. 2022 MCA, *i.e.,* **more than twice** *the maximum lawful rate of interest allowed by New York law.*[11]

76.     Between February 17, 2022 and the date hereof, LG has collected $105,280.00 from BT Welding (and continues to collect), with *each and every* withdrawal *always* in the same amount of $3,760.00—*like a loan*.

### LG and OnTrack are Engaged In Interstate Commerce

77.     LG is engaged in interstate commerce and uses the instrumentalities of interstate commerce in its daily business activities, including unlawful lending and the collection of unlawful debt, as described herein.

78.     LG maintains offices in New York (*e.g.*, 1218 Union Street, Brooklyn, New York, NY11225) and uses personnel in these offices to originate, underwrite, fund, service, and collect upon the usurious loans made by LG to entities in Florida, including Plaintiffs, and throughout the United States via extensive use of interstate emails, mail, wire transfers, and bank withdrawals processed through an automated clearing house.

---

[11] Internal records prepared by LG demonstrate that LG did not credit Plaintiffs for all amounts paid under the prior MCAs (*i.e.*, the March 2021 MCA and Sept. 2021 MCA) and, thus, the interest rate calculated herein represents the most accurate calculation of the true interest rate by comparing the (a) amount actually loaned to Plaintiffs and (b) the total amount Plaintiffs were expected to repay LG, and adjusting that interest rate for the repayment duration (calculated by dividing the repayment amount by the weekly installment amount).  *See, e.g.,* **Exhibit 10** (Internal Report prepared by LG and sent to Plaintiffs by Chaim Zagelbaum (chaim@lgfunding.com) detailing repayment under the Feb. 2022 MCA between Feb. 17, 2022 and Aug. 19, 2022).

79.     In furtherance of its unlawful lending business, LG commences actions against merchants and their personal guarantors in New York[12] and across the United States[13] in an effort to enforce its bogus, misleadingly labeled, usurious loans.

80.     Upon information and belief, all communications between the members of LG and its merchant-borrowers and their guarantors were by interstate email and U.S. Mail, text message, wire transfers or ACH debits, and other interstate wire communications.

81.     Upon information and belief, LG: (i) drafted and underwrote each of the Contracts from New York, which was subsequently transmitted via e-mail to Plaintiffs in Florida, who then countersigned and returned the same to Defendants at their offices in New York via email; (ii) funded each of the Contracts by wire transfer from its bank account with Signature Bank in New York to Plaintiffs in Florida; and (iii) serviced and collected upon the usurious loans through ACH debits from Plaintiffs' bank account in Florida to its bank account in New York.

82.     LG's unlawful acts engage in or affect interstate commerce in that LG is a business formed under the laws of New York and maintaining its principal place of business in New York

---

[12] *See, e.g., LG Funding LLC v. Main Street Motors, LLC et al*, Index No. 509193/2014 (Kings Sup. Ct. Oct. 7, 2014); *LG Funding, LLC v. Errol Estate Golf & Country Club, Inc. et al*, Index No. 501799/2015 (Kings Sup. Ct. Feb. 17, 2015); *LG Funding, LLC v. Richard's Paving and Sealcoating LLC et al*, Index No. 512113/2016 (Kings Sup. Ct. July 15, 2016); *LG Funding, LLC v. ANJL Ventures, LLC et al*, Index No. 601817/2017 (Nassau Sup. Ct. March 2, 2017); *LG Funding LLC v. Capital Coatings and Linings, Inc. et al*, Index No. 604721/2018 (Nassau Sup. Ct. April; 11, 2018); *LG Funding LLC v. B & R Towing and Auto Repair LLC et al*, Index No. 602330/2019 (Nassau Sup. Ct. Feb. 18, 2019); *LG Funding LLC v. Jace Johnson Construction, L.L.C. et al*, Index No. 602512/2020 (Nassau Sup. Ct. Feb. 19, 2020); *LG Funding LLC v. D & K Nautical, LLC et al*, Index No. 603979/2021 (Nassau Sup. Ct. March 31, 2021); *LG Funding LLC v. Platinum Plus Auto Protection Inc. et al*, Index No. 609224/2022 (Nassau Sup. Ct. July 14, 2022).
[13] *See, e.g., LG Funding LLC v. Craig*, Docket No. 1:20-ap-01267 (Bankr. D. Colo. Sep 22, 2020); *LG Funding, LLC v. Odom Construction Services, Inc., Veronica Odom and Mark Odom*, Docket No. 1-14-479 (Tex. County Ct. Oct. 10, 2014); *LG Funding LLC vs. Randy Pierson and Grand Prix International LLC d/b/a Avon Marine*, Docket No. 73-CV-14-8771 (Minn. Dist. Ct. Oct. 9, 2014).

that lends money to businesses located outside the State of New York, utilizes the means of interstate commerce (*e.g.*, wire transfer) to send money from its bank account with Signature Bank in New York to bank accounts located outside the State of Florida,  and utilizes the means of interstate commerce (*e.g.*, ACH withdrawals) to withdraw money from bank accounts located outside New York and direct such monies into its bank accounts maintained with Signature Bank in New York.

83.    OnTrack is engaged in interstate commerce and uses the instrumentalities of interstate commerce in its daily business activities, including unlawful lending and the collection of unlawful debt, as described herein.

84.    OnTrack maintains offices in New York (*e.g.*, 1413 Avenue J, Brooklyn, NY 11230) and uses personnel in these offices to identify, solicit, originate, underwrite, fund, service, and collect upon the usurious loans made by OnTrack and/or its MCA partners (*e.g.*, LG) to entities throughout the United States via extensive use of interstate e-mails, mail, wire transfers, and bank withdrawals processed through an automated clearing house.

85.    Here, OnTrack affected interstate commerce by undertaking certain acts in the State of New York to solicit, enforce, and collect upon a usurious debt that was created outside the State of Florida, including by repeatedly collecting a "broker fee" from Plaintiffs for services OnTrack provided to LG via an interstate wire transfer.

### *The LG-OnTrack RICO Enterprise*

86.    Together, LG and OnTrack constitute an association-in-fact enterprise within the meaning of RICO (the "LG-OnTrack Enterprise").  *See* 18 U.S.C. § 1961(4).

87.     The LG-OnTrack Enterprise collects debts arising from its phony MCAs—including the Contracts—charging a true interest rate that exceeds twice New York's maximum enforceable interest rate, in violation of RICO.  *See* 18 U.S.C. § 1962(c).

88.     The LG-OnTrack Enterprise commits its violations of RICO under the direction and control of Lerman, and, upon information and belief, OnTrack Control Persons, both of whom are "culpable persons" within the meaning of RICO (the "LG-OnTrack Managers").  *See* 18 U.S.C. § 1961(3).

89.     The LG-OnTrack Managers, upon information and belief, have agreed and conspired to violate RICO (§ 1962(c)) in the manner alleged herein, in violation of RICO.  *See* 18 U.S.C. § 1962(d).

90.     The enterprise on the one hand, and its culpable persons, on the other, are sufficiently distinct from one another to satisfy the requirements of RICO.

91.     Lerman is a RICO culpable person because, *inter alia*:

a.  Lerman is an individual capable of holding a legal or beneficial interest in property.

b.  Upon information and belief, Lerman is the manager of LG, and at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control LG's statements, representations, and decisions.

c.  Upon information and belief, Lerman is responsible for the day-to-day operations of the enterprise and has final say on all its business decisions, including without limitation which usurious loans the enterprise will fund, how such usurious loans will be funded, and the ultimate payment terms, amount and period of each usurious loan, including the LG Loans in this case.

d.  Upon information and belief, in his capacity as the day-to-day leader of the enterprise, Lerman is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the enterprise to accomplish its overall goals and purposes, chiefly among which being unlawful lending, including: (i) supervising agents and/or employees of the enterprise who solicit and connect with merchants in need of funding that are candidates for the enterprise's unlawful loans, including the LG Loans in this case; (ii) determining the form of the agreements used by the enterprise to disguise its unlawful loans as bona fide purchases of merchant receivables and hide its true business of unlawful, usurious lending, including the LG Loans in this case; (iii) determining the amount and repayment period of the usurious loans made to merchants, including the LG Loans in this case; (iv) approving the making of the unlawful loans made to merchants that have applied for such loans, including the LG Loans in this case; and (v) establishing and maintaining the methods of collecting the payments on the unlawful loans, including via ACH withdrawals, and, by threatening, harassing, and seeking to intimidate merchants that refuse to allow further collection of the unlawful debts.

e.  Upon information and belief, Lerman takes actions and directs other members, employees, and/or agents of the enterprise to take actions necessary to accomplish the aforesaid overall goals and purposes of the enterprise, including, as necessary.

f.  Upon information and belief, through salary, bonuses, profits, and/or other distributions from the enterprise, Lerman has ultimately benefited from the

enterprise's funneling to him of a portion or all of the unlawful loan proceeds, including those from the LG Loans in this case.

g.  Upon information and belief, Lerman meets, communicates, plans, shares information, and coordinates with the other culpable persons in order to, *inter alia*:  (i) determine the enterprise's overall goals and purposes; (ii) take actions and direct other members, employees, and/or agents of the enterprise to take actions necessary to accomplish the aforesaid overall goals and purposes of the enterprise; (iii) determine or adjust the salary, bonuses, profits, and/or other distributions from the enterprise that each culpable person receives from the enterprise's funneling to him of a portion or all of the usurious loan proceeds, including those from the LG Loans in this case; and (iv) to achieve such other purposes and ends as are needed to advance. maintain, and perpetuate the agreement and conspiracy among the culpable persons as alleged herein.

92.  OnTrack Control Persons are RICO culpable persons because, *inter alia*:

a.  OnTrack Control Persons are individuals capable of holding a legal or beneficial interest in property;

b.  Upon information and belief, OnTrack Control Persons are the managers of OnTrack, and at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control OnTrack's statements, representations, and decisions; and

c.  Upon information and belief, OnTrack Control Persons are responsible, at a minimum, for creating, approving, and implementing the policies, practices, and instrumentalities used by the enterprise to accomplish its overall goals and

purposes, including identifying, soliciting, connecting with merchants in need of funding that are candidates for the enterprise's unlawful loans, including the LG Loans in this case;

d.   Upon information and belief, OnTrack Control Persons take actions and directs other members, employees, and/or agents of the enterprise to take actions necessary to accomplish the aforesaid overall goals and purposes of the enterprise;

e.   Upon information and belief, through salary, bonuses, profits, and/or other distributions from the enterprise, OnTrack Control Persons have ultimately benefited from the enterprise's funneling to him of a portion or all of the unlawful loan proceeds, including those from the LG Loans in this case.

93.   Upon information and belief, the LG-OnTrack Managers—by and through the employees and agents of the LG-OnTrack Enterprise, and via their own actions on behalf of the enterprise—have conducted and participated in the affairs of the enterprise in its business of collecting unlawful debts in all the ways alleged herein, including, *inter alia*:  (i) soliciting and facilitating Plaintiffs' applications for the LG Loans and the execution thereof, through their agents and/or employees; and (ii) arranging and executing ACH withdrawals from Plaintiffs' business accounts to collect the aforesaid unlawful debts.

94.   Upon information and belief, most or all of the actions of the LG-OnTrack as culpable persons have occurred through the means and instrumentalities of interstate commerce, as alleged in greater detail in ¶¶ 77–85.

95.     At all times relevant hereto, the LG-OnTrack Managers have intended to engage in the violations of RICO alleged herein, with actual knowledge of their illegal activities, and not in good faith.

96.     The violations of RICO alleged herein against the LG-OnTrack Enterprise and the LG-OnTrack Managers have injured and continue to injure Plaintiffs in their business and property as alleged in greater detail in ¶¶ 107–112.

### The LG RICO Enterprise (In the Alternative)

97.     Plaintiffs plead the following, in the alternative to paragraphs 86–96 herein.

98.     LG is an enterprise within the meaning of RICO (the "LG Enterprise").  *See* 18 U.S.C. § 1961(4).

99.     The LG Enterprise collects debts arising from its phony MCAs—including the Contracts—charging a true interest rate that exceed twice New York's maximum enforceable interest rate, in violation of RICO.  *See* 18 U.S.C. § 1962(c).

100.    The LG Enterprise commits its violations of RICO under the direction and control of Lerman, who is a "culpable person" within the meaning of RICO.  *See* 18 U.S.C. § 1961(3).

101.    The enterprise on one hand, and its culpable person, on the other, are sufficiently distinct from one another to satisfy the requirements of RICO.

102.    Lerman is a RICO culpable person because, *inter alia*:

    a.  Lerman is an individual capable of holding a legal or beneficial interest in property.

    b.  Upon information and belief, Lerman is the manager of LG, and at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control LG's statements, representations, and decisions.

c.  Upon information and belief, Lerman is responsible for the day-to-day operations of the enterprise and has final say on all its business decisions, including without limitation which usurious loans the enterprise will fund, how such usurious loans will be funded, and the ultimate payment terms, amount and period of each usurious loan, including the LG Loans in this case.

d.  Upon information and belief, in his capacity as the day-to-day leader of the enterprise, Lerman is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by the enterprise to accomplish its overall goals and purposes, chiefly among which being unlawful lending, including:  (i) supervising agents and/or employees of the enterprise who solicit and connect with merchants in need of funding that are candidates for the enterprise's unlawful loans, including the LG Loans in this case; (ii) determining the form of the agreements used by the enterprise to disguise its unlawful loans as bona fide purchases of merchant receivables and hide its true business of unlawful, usurious lending, including the LG Loans in this case; (iii) determining the amount and repayment period of the usurious loans made to merchants, including the LG Loans in this case; (iv) approving the making of the unlawful loans made to merchants that have applied for such loans, including the LG Loans in this case; and (v) establishing and maintaining the methods of collecting the payments on the unlawful loans, including via ACH withdrawals.

e.  Upon information and belief, Lerman takes actions and directs employees and/or agents of the enterprise to take actions necessary to accomplish the aforesaid overall goals and purposes of the enterprise.

103.    Upon information and belief, Lerman, by and through the employees and agents of the LG has conducted and participated, and continues to conduct and participate, in the affairs of the enterprise in its business of collecting unlawful debts by in all the ways alleged herein, including, *inter alia*:  (i) soliciting and facilitating Plaintiffs' application for the Contracts and the execution thereof; and (ii) arranging and executing ACH withdrawals from Plaintiffs' business accounts to collect the aforesaid unlawful debts.

104.    Upon information and belief, most or all of Lerman's actions as a culpable person occur through the means and instrumentalities of interstate commerce, as alleged in greater detail in ¶¶ 77–85.

105.    At all times relevant hereto, Lerman has intended to engage in the violations of RICO alleged herein, with actual knowledge of the illegal activities, and not in good faith.

106.    The violations of RICO alleged herein against the LG Enterprise and Lerman have injured and continue to injure Plaintiffs in its businesses and properties as alleged in greater detail in ¶¶ 107–112.

### *Causation and Injury*

107.    Each of the Defendants is an individual or legal entity capable of holding a legal or beneficial interest in property.

108.    Plaintiffs would not have suffered injury and damages but for the violations of RICO alleged herein, including both the overt acts of collecting unlawful debt and conspiracy.

109.    The injuries to the Plaintiffs directly, proximately, reasonably, and foreseeably resulting from or caused by the violations of RICO alleged herein include, but are not limited to, the payment of hundreds of thousands of dollars of unlawful debt based on Contracts that violate the criminal laws of New York by charging in excess of the maximum enforceable rate of interest.

110.    Plaintiffs have also suffered damages by incurring (a) banking and overdraft fees and (b) attorneys' fees and costs associated with exposing, prosecuting, and defending against the violations of RICO alleged herein.

111.    All of the foregoing harm was foreseeable by Defendants and was directly and proximately caused by their violations of RICO alleged herein.

112.    The assessment of the total damage to Plaintiffs due to the violations of RICO alleged herein is difficult to quantify and will be determined at trial.

## FIRST CAUSE OF ACTION

### RICO:  18 U.S.C. § 1962(c)

### Against All Defendants

113.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of Paragraphs 1–96 and 107–112 as though set forth herein.

### RICO Enterprise

114.    The LG-OnTrack Enterprise is an association-in-fact "enterprise" within the meaning of RICO, § 1961(4).

115.    The enterprise's goal is to solicit, fund, service, and collect upon loans deceitfully advertised and labeled as MCAs that charge interest at more than lawful maximum enforceable rate allowed by the laws of New York.

116.     The enterprise is in the business of collecting such unlawful debts arising from its phony MCAs—including the Contracts—charging a true interest rate that exceeds twice New York's maximum enforceable interest rate.

117.     The enterprise, through its owners, agents, and/or employees:  (i) locates and solicits merchants; (ii) offers funding to merchants; (iii) determines the form of the MCA contracts, including the purchase price, purchased amount, and daily/weekly payments; (iv) funds the usurious loans; and (v) collects the unlawful debt imposed by the MCA contracts.

118.     The enterprise benefitted from the unlawful debt collection and/or wire fraud by receiving all or a portion of the proceeds of the unlawful, usurious debt.

119.     The enterprise commits its violations of RICO under the direction and control of the LG-OnTrack Managers.

120.     The enterprise conducts its unlawful business through the means and instrumentalities of interstate commerce.  *See* paragraphs 77–85, *supra.*

121.     Lerman and OnTrack Control Persons are each a "culpable person" within the meaning of RICO, § 1961(3).

**RICO Act:  Unlawful Debt Collection**

122.     RICO defines, in relevant part, an "unlawful debt" as:

> unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).

123.     Each of the Contracts is governed by New York law, which prohibits the charging, taking, or receiving of interest at a rate exceeding 25% APR.  *See Adar Bays*, 37 N.Y.3d at 325-333; N.Y. Penal Law § 190.40.  *See also* N.Y. Gen. Oblig. L. §§ 5-501, 5-511, 5-521.

124.     As alleged herein, the true character of each of the LG Loans—imposed through the Contracts—*is a loan*, subject to New York's usury laws.

125.     Through *each* of the LG Loans, LG charged, took, and received interest at a rate exceeding 50% A.P.R., more than twice the maximum lawful rate of interest allowed by New York law.

**RICO Act:  Pattern of Racketeering by Wire Fraud**

126.     RICO defines, in relevant part, "racketeering activity" as "fraud by wire," within the meaning set forth in 18 U.S.C. § 1343.  *See* 18 U.S.C. § 1961(1).

127.     The LG-OnTrack Enterprise committed fraud by wire when it made false or fraudulent statements and/or representations concerning the true character of the LG Loans through e-mail communications and electronic wire transfers of monies that were made to originate, underwrite, service, and collect upon the LG Loans.

128.     The foregoing statements are false because the LG Loans are, in truth, loans since, notwithstanding their form, the Contracts require (i) fixed weekly repayment installments, (ii) a security interest in all of Plaintiffs' business "accounts," "general intangibles," and "payment intangibles," as each are defined in the UCC, and (iii) Taylor to grant a personal guarantee because the Contracts rely on the creditworthiness of the business plaintiffs, rather than its customers, vendors, and/or third-party payors who owed the receivables, among other reasons.

129.     The foregoing false statements were made in order to induce Plaintiffs into entering into the LG Loans, pursuant to which the LG-OnTrack Enterprise would fraudulently collect monies from Plaintiffs.

130.     Defendants committed fraud by wire transfer when they collected upon the LG Loans via interstate electronic ACH debits.

131.     The LG-OnTrack Enterprise repeatedly and continuously committed fraud by wire, both against Plaintiffs and other merchants similarly victimized by Defendants' false representations concerning the true character of their MCA business, in order to conduct the affairs of the LG-OnTrack Enterprise which constitutes a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

**RICO Damages**

132.     The violations of RICO alleged herein have injured and continue to injure Plaintiffs in their business and property.

133.     The injuries to the Plaintiffs directly, proximately, reasonably, and foreseeably resulting from or caused by the violations of RICO alleged herein include, but are not limited to, the payment of hundreds of thousands of dollars of unlawful debt based on Contracts.

134.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing, prosecuting, and defending against the unlawful acts alleged herein.

135.     All of the foregoing harm was foreseeable by Defendants and was directly and proximately caused by Defendants' violations of RICO alleged herein.

136.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages plus the cost of this action, including reasonable attorneys' fees, from Defendants.

**SECOND CAUSE OF ACTION**

*RICO Conspiracy:  18 U.S.C. § 1962(d)*

*Against All Defendants*

137.     Plaintiffs repeat, reiterate, and re-allege each and every allegation of Paragraphs 1–96 and 107–136 as though set forth herein.

138.     The LG-OnTrack Managers, upon information and belief, intentionally agreed and conspired to, by and through their agents, employees, and/or by acts taken personally by

themselves, to conduct and participate in the affairs of the LG-OnTrack Enterprise by engaging in the business of collecting unlawful debts and/or wire fraud in the manner alleged herein.

139.    By and through each of the LG-OnTrack Enterprise member's business relationship with one another, their close coordination with one another in the affairs of the enterprise, and frequent communication among the Defendants and the LG-OnTrack Enterprise members concerning the underwriting, funding, servicing and collecting of the unlawful loans, including the LG Loans, Defendants knew the nature of the LG-OnTrack Enterprise and Defendants knew the LG-OnTrack Enterprise extended beyond each LG-OnTrack Enterprise member's individual role. Moreover, through the same connections and coordinations, Defendants knew that the other LG-OnTrack Enterprise members were engaged in a conspiracy to collect upon unlawful debt and/or commit wire fraud in violation of 18 U.S.C. § 1962(c).

140.    Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of the LG-OnTrack Enterprise's affairs in order to collect upon unlawful debts, including the LG Loans in this case, and/or commit wire fraud in violation of 18 U.S.C. § 1962(c).  Specifically, Defendants were a knowing, willing, and active participant in the LG-OnTrack Enterprise and its affairs and each of the LG-OnTrack Enterprise members shared a common purpose, namely the planning, preparation, and execution, of the scheme to solicit, underwrite, fund and collect, upon unlawful debts, including the LG Loans.

141.    Defendants also agreed to facilitate, conduct, and participate in the conduct, management, or operation of the LG-OnTrack Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

142.    The participation and agreement of Defendants and each LG-OnTrack Enterprise member was necessary to allow the commission of this scheme.

143.    The violations of RICO alleged herein have injured and continue to injure Plaintiffs in their business and property.

144.    The injuries to the Plaintiffs directly, proximately, reasonably, and foreseeably resulting from or caused by the violations of RICO alleged herein include, but are not limited to, the payment of hundreds of thousands of dollars of unlawful debt based on Contracts.

145.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing, prosecuting, and defending against the unlawful acts alleged herein.

146.    All of the foregoing harm was foreseeable by Defendants and was directly and proximately caused by Defendants' violations of RICO alleged herein.

147.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages plus the cost of this action, including reasonable attorneys' fees, from Defendants.

## THIRD CAUSE OF ACTION

### RICO:  18 U.S.C. § 1962(c)

### Against LG and Lerman

#### (In the Alternative to
#### First and Second Causes of Action)

148.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of Paragraphs 1–85 and 97–112 as though set forth herein.

### RICO Enterprise

149.    The LG Enterprise is an association-in-fact "enterprise" within the meaning of RICO, § 1961(4).

150.    The enterprise's goal is to solicit, fund, service, and collect upon loans deceitfully advertised and labeled as MCAs that charge interest at more than lawful maximum enforceable rate allowed by the laws of New York.

151.    The enterprise is in the business of collecting such unlawful debts arising from its phony MCAs—including the Contracts—charging a true interest rate that exceeds twice New York's maximum enforceable interest rate.

152.    The enterprise, through its owners, agents, and/or employees:  (i) locates and solicits merchants; (ii) offers funding to merchants; (iii) determines the form of the MCA contracts, including the purchase price, purchased amount, and daily/weekly payments; (iv) funds the usurious loans; and (v) collects the unlawful debt imposed by the MCA contracts.

153.    The enterprise benefitted from the unlawful debt collection and/or wire fraud by receiving all or a portion of the proceeds of the unlawful, usurious debt.

154.    The enterprise commits its violations of RICO under the direction and control of Lerman.

155.    The enterprise conducts its unlawful business through the means and instrumentalities of interstate commerce.  *See* paragraphs 77–85, *supra.*

156.    At all times relevant hereto, Lerman has intended to engage in the violations of RICO alleged herein, with actual knowledge of the illegal activities, and not in good faith

157.    Lerman is a "culpable person" within the meaning of RICO, § 1961(3).

**RICO Act:  Unlawful Debt Collection**

158.    RICO defines, in relevant part, an "unlawful debt" as:

> unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).

159.    Each of the Contracts is governed by New York law, which prohibits the charging, taking, or receiving of interest at a rate exceeding 25% APR.  *See Adar Bays*, 37 N.Y.3d at 325-333; N.Y. Penal Law § 190.40.  *See also* N.Y. Gen. Oblig. L. §§ 5-501, 5-511, 5-521.

160.    As alleged herein, the true character of each of the LG Loans—imposed through the Contracts—*is a loan*, subject to New York's usury laws.

161.    Through *each* of the LG Loans, LG charged, took, and received interest at a rate exceeding 50% A.P.R., *i.e.*, more than twice the maximum lawful rate of interest allowed by New York law.

**RICO Act:  Pattern of Racketeering by Wire Fraud**

162.    RICO defines, in relevant part, "racketeering activity" as "fraud by wire," within the meaning set forth in 18 U.S.C. § 1343.  *See* 18 U.S.C. § 1961(1).

163.    The LG Enterprise committed fraud by wire when it made false or fraudulent statements and/or representations concerning the true character of the LG Loans through e-mail communications and electronic wire transfers of monies that were made to originate, underwrite, service, and collect upon the LG Loans.

164.    The foregoing statements are false because the LG Loans are, in truth, loans because, notwithstanding their form, the Contracts require (i) fixed weekly repayment installments, (ii) a security interest in all of Plaintiffs' business "accounts," "general intangibles," and "payment intangibles," as each are defined in the UCC, and (iii) Taylor to grant a personal guarantee because the Contracts rely on the creditworthiness of the business plaintiffs, rather than its customers, vendors, and/or third-party payors who owed the receivables, among other reasons.

165.    The foregoing false statements were made in order to induce Plaintiffs into entering into the LG Loans, pursuant to which the LG Enterprise would fraudulently collect monies from Plaintiffs.

166.    Defendants committed fraud by wire transfer when they collected upon the LG Loans via interstate electronic ACH debits.

167.    The LG Enterprise repeatedly and continuously committed fraud by wire, both against Plaintiffs and other merchants similarly victimized by Defendants' false representations concerning the true character of their MCA business, in order to conduct the affairs of the LG Enterprise which constitutes a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

**RICO Damages**

168.    The violations of RICO alleged herein have injured and continue to injure Plaintiffs in their business and property.

169.    The injuries to the Plaintiffs directly, proximately, reasonably, and foreseeably resulting from or caused by the violations of RICO alleged herein include, but are not limited to, the payment of hundreds of thousands of dollars of unlawful debt based on Contracts.

170.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing, prosecuting, and defending against the unlawful acts alleged herein.

171.    All of the foregoing harm was foreseeable by Defendants and was directly and proximately caused by Defendants' violations of RICO alleged herein.

172.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages plus the cost of this action, including reasonable attorneys' fees, from Defendants.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so properly tried.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order from the Court:

a.      declaring each of the Contracts—and the LG Loans imposed thereby—to be usurious loans in violation of New York Penal Law § 190.40 and, thus, void *ab initio* and unenforceable;

b.      awarding Plaintiffs compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at trial;

c.      awarding Plaintiffs treble damages;

d.      directing Defendants to pay Plaintiffs' attorneys' fees and costs; and

e.      any and all further relief the Court deems just and proper.


Dated: September 7, 2022

                                        Respectfully Submitted,

                                        **THE BASILE LAW FIRM P.C.**

                                        By:  */s/ Eric J. Benzenberg*
                                             Eric J. Benzenberg, Esq.
                                             Christopher M. Basile, Esq.
                                             390 N. Broadway, Ste 140
                                             Jericho, NY 11753
                                             Tel.:   (516) 455-1500
                                             Fax:   (631) 498-0748
                                             Email: eric@thebasilelawfirm.com
                                                     chris@thebasilelawfirm.com

                                        *Attorneys for Plaintiffs Blane E. Taylor Welding, Inc. and Blane E. Taylor*